**Randolph Lewis STEWART, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. B14–83–203–CR.**

Court of Appeals of Texas,
Houston (14th Dist.).

Oct. 4, 1984.

Bradford Yock, Houston, for appellant.

Calvin Hartmann, Asst. Dist. Atty., Houston, for appellee.

## OPINION ON MOTION FOR REHEARING EN BANC

SEARS, Justice.

On Motion for Rehearing, En Banc, the original opinion is withdrawn and the judgment of the Trial Court is reversed and remanded.

This case involves the question of whether a warrantless entry by police into the private apartment of Appellant was justified under the "emergency doctrine."

Appellant was convicted, in a trial to the court, of manufacturing methamphetamine. He received a probated sentence and a

$4000 fine. The conviction was affirmed by two justices of this court and a dissent was written by Justice Ellis. Appellant timely filed a motion for rehearing, en banc, which was granted.

Appellant and a co-defendant, Green, were tried separately and both were convicted of manufacturing methamphetamine. On appeal, Green's conviction was reversed. *Green v. State*, 666 S.W.2d 291 (Tex.App.—Houston [14th Dist.] 1983, no pet.). The opinion in *Green* concluded the stipulation of evidence was invalid as it lacked the signature of the trial judge, and warrantless entry was not justified under the emergency doctrine. In the first *Stewart* opinion, the majority concluded an "emergency" existed, therefore a warrantless search was justified, and the introduction into evidence of contraband seized was lawful and proper.

Appellant raises five grounds of error, however our treatment of the first ground of error is dispositive of this case. Appellant complains in ground of error one that the trial court erred in holding that the warrantless entry of the apartment was lawful. We agree, and ground of error one is sustained.

Before we reach the "emergency" issue, we feel it important to respond to the State's position that Appellant cannot complain about the introduction of evidence because Appellant executed a "Stipulation of Evidence" and thereby agreed that the court could base its finding of guilt or innocence on this evidence. The Appellant handled the trial and the stipulation correctly, as he followed the instructions of this court in *Zappas v. State*, 650 S.W.2d 131 (Tex.App.—Houston [14th Dist.] 1982, pet. granted). It must be understood that a "Stipulation of Evidence" is not an agreement that the evidence or testimony is admissible or that the testimony is truthful. It is merely an agreement to waive cross-examination of witnesses and agree that the written version of their testimony is the same as it would be if they were present in the courtroom. Further, in this case, the

Stipulation of Evidence contained the following language:

> The parties agree that the Defendant does not waive his right to complain of the legality of the search or warrant in this cause.

It is clear that Appellant at all times complained of the court's error in overruling the Motion to Suppress and in admitting evidence seized pursuant to the unlawful entry into Appellant's apartment. It is also clear that the court and the State understood and agreed to Appellant's right to appeal that ruling of the court.

In addition to the Stipulation of Evidence, the record contains the statement of facts from the hearing on the Motion to Suppress and the tape recording of conversations with the Houston Fire Department (H.F.D.) and the Houston Police Department (H.P.D.). The record establishes that a resident of an apartment complex called the H.F.D. at 3:59 a.m. complaining of a "gaseous odor" in the area. Mark Key, an eight year veteran of H.F.D., responded with a unit, discovered the complex was completely electrical, and ruled out the possibility of a natural gas leak. Key talked with the couple who made the complaint and learned they had been bothered by this order for the past week. Key determined the odor was ether, but a walk-around of the complex failed to locate the source. Key had never encountered any problems or responded to any emergency calls regarding ether. He recognized the odor because he had previously purchased it at an auto parts store and used it on his car. He called the H.F.D. dispatcher, and reported "a definite smell of ether all through the apartments." He reported the complainant "smelled it every night and suspected someone was making dope." He requested instructions on what course of action to take. The dispatcher talked with the chief dispatcher who advised that the people call H.P.D. and said, "The best thing to do is to let him (complainant) handle it on his end, and tell him there's really nothing we can do about it." Key told the couple to call H.P.D. and returned to the fire station confident that no emergency existed.

The couple then called H.P.D. and reported the smell of ether, the suspicion of dope and related that H.F.D. had responded, found no emergency and advised them to call H.P.D. Officer Shirley of H.P.D. responded, smelled a strong odor of ether, and from his past experience in narcotics, suspected a methamphetamine laboratory. Shirley investigated and discovered apartment 69 to be the source of the ether. A "cloud" of ether was seen on the patio of the apartment and appeared to emanate from the doors and/or windows of apartment 69. The record is not clear at this point whether Shirley or some other police officer called the Harris County District Attorney's office. However, someone talked to an assistant district attorney who advised him to call H.F.D. Officer Shirley at this time called H.F.D. from the complainant's apartment, and talked to Key. Key advised Shirley that ten to fifteen minutes earlier he had investigated the ether odor and found no emergency situation. Shirley stated that the odor was much stronger now and that apartment 69 was the source. Key advised that, if the odor was "that strong," Shirley should knock on the door of the apartment, and *if no one answers*, to enter and air out the apartment. Shirley then called H.P.D., reported locating the source of the ether, and stated "we're going inside to check it out." Shirley then proceeded to apartment 69, knocked on the door, and waited *ten minutes* before Appellant opened the door. The "cloud" and the smell were stronger when the door was opened and Shirley immediately rushed past Appellant, entered the apartment without consent, opened windows and saw "in plain view" a methamphetamine laboratory. Appellant and Green were placed under arrest, other officers were called to the scene, a search warrant was obtained, and the evidence was seized.

For purposes of this appeal, we find it unnecessary to deal with the issuance of the subsequent search warrant. Shirley's warrantless entry was either good

or bad in law the instant it was made. *United States v. Di Re*, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948). Therefore, the subsequent issuance of a search warrant cannot justify a previous unjustifiable act and make evidence admissible that is otherwise inadmissible. A "search" occurs when "an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, — U.S. —, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984).

■ We must first approach this appeal with the viewpoint that any search conducted *outside* the judicial process, and without *prior* approval of a judge or magistrate, is *per se* unreasonable under the Fourth Amendment to the Constitution of the United States. *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). We next look to specific exceptions to the above rule to determine if our facts fall within these well delineated exceptions. There are three exceptions under which a warrantless search and seizure can be held justified: (1) "Plain view" doctrine, (2) "consent," or (3) "emergency" doctrine. *Root v. Gauper*, 438 F.2d 361 (8th Cir. 1971). The "plain view" doctrine carries with it the requirement that the officers have the right to be where they are when they first "view" the evidence in question. *Harris v. United States*, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968). This exception will apply only if we find that Shirley had a right to be in Appellant's apartment in the first place. There is nothing in the record to show that the lab was visible from outside the apartment. Further, the "consent" exception cannot help the State because there is no evidence to support a claim that Appellant or any one else consented to Shirley's entry of Appellant's apartment. We are therefore left with the "emergency doctrine" exception as the only avenue available to the State to justify the introduction into evidence of the items seized.

■ The emergency doctrine originated in dictum in Justice Jackson's opinion in *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1947):

> There are exceptional circumstances in which, on balancing the need for effective law enforcement against the right of privacy, it may be contended that a magistrate's warrant for search may be dispensed with.

The U.S. Supreme Court expanded on the foregoing by establishing an emergency exception when an officer hears a cry for help and demands entrance in the name of the law. *McDonald v. United States*, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948). Since that time, the emergency doctrine has been applied in many varying circumstances, however they all fall into one of three categories:

(1) to render emergency aid or assistance to persons whom they reasonably believe to be in distress or in need of assistance.[1]

(2) to prevent the destruction of evidence or contraband.[2]

(3) to protect the officers from other suspects or persons whom they reasonably believe may be present, and if so, they reasonably believe may be armed and dangerous.[3]

■ In applying the facts of this case to the foregoing categories of emergency exceptions, we can immediately eliminate (2) and (3). Officer Shirley testified that he had no reason to believe Appellant or anyone else was disposing of contraband, and, there is no evidence in the record to indicate that Shirley believed there was anyone armed and dangerous in the apartment. Therefore, in order for officer Shirley's warrantless entry into Appellant's apartment to be justified, officer Shirley must have entered to protect the occupants of

---

1. ...*Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).

2. ...*Vale v. Louisiana*, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970).

3. ...*Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

the apartment from harm or to render aid and assistance if he *reasonably* believed them to be in distress.

An objective standard as to the reasonableness of the officer's belief was established in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968):

> In justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.... And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search, warrant a man of reasonable caution in the belief that the action taken was appropriate?

Applying the above standard to the instant case, we conclude the action of Shirley was not justified by any emergency condition. Shirley, in response to a leading question by the State, testified that his primary concern was for the safety of the people inside apartment 69 and the residents of all the apartments. However, his following actions contradict his alleged motives:

(1) Shirley smelled ether and suspected a methamphetamine laboratory.

(2) He took the time to call or have someone call the Harris County District Attorney's office for advice prior to entering the apartment.

(3) On the advice of an assistant district attorney he called H.F.D.

(4) H.F.D. advised him to enter the apartment *if* no one answered the door.

(5) He testified he would have entered the apartment regardless of what H.F.D. advised.

(6) He took the time to call H.P.D. and advise the dispatcher he was entering the apartment.

(7) He knocked on the door of apartment 69 and waited *10 minutes* for Appellant to open the door.

(8) He failed to get a pass key from the security guard or apartment manager and *immediately* enter apartment 69.

(9) He failed to inquire of Appellant if he was in need of aid or assistance before entering the apartment.

(10) He failed to determine if any other persons were in the apartment and in need of aid or assistance before entering the apartment.

(11) There is no evidence that anyone in the entire complex was in need of aid or assistance and there is no reasonable belief that anyone was.

(12) He failed to notify H.F.D. of any emergency that threatened the lives of the residents of the complex. The first time he called Key he was seeking advice, and the second call was to report finding a dope laboratory.

(13) He failed to notify H.P.D. of any life threatening emergency, instead he told them he suspected dope and was going in.

(14) He failed to take any precautions or to seek any assistance to remove any persons from a potential danger zone.

(15) He did not respond immediately to what he claimed was an emergency situation.

The gist of all of the case law dealing with the emergency exception is the need to act *immediately*, thus negating the possibility of obtaining a search warrant. The only reasonable justification for an exception to the *per se* unreasonableness of such a warrantless intrusion is the emergency of the situation. The actions of Shirley do not lead us to believe that he reasonably believed an emergency existed. Even if he thought Appellant and others were overcome by ether in the apartment, and entered to give *them* aid and assistance, this "emergency" terminated the minute Appellant opened the door. The record contains no evidence that Appellant or Green were in need of aid or assistance. We cannot,

even in retrospect, reasonably conclude any other residents were in any "immediate" danger.

The facts in this appeal are very similar to those in *Bray v. State*, 597 S.W.2d 763 (Tex.Crim.App.1980). In both cases, persons specially trained to handle the "emergency" were on the scene prior to the arrival of the police. In both cases the trained persons concluded no emergency existed and left the scene. In both cases the police could have requested consent to enter and failed to do so. In both cases the unjustified entry was, at least in part, motivated by the belief a crime had been committed. The *Bray* court noted:

> There is a difference between rendering emergency aid and investigating the possibly criminal cause of the emergency. The emergency doctrine justifies the former, but it does not always justify the latter.

*See also Root v. Gauper*, 438 F.2d 361 for a similar fact situation.

In *Provost v. State*, 631 S.W.2d 173 (Tex. App.—Houston [1st Dist.] 1981, pet. ref'd), the State contended an emergency justified a warrantless entry into a home. The court of appeals rejected that contention because the police did not act immediately, but instead they: (1) telephoned the District Attorney, (2) telephoned the fire department, and (3) waited ten minutes before entering.

■ The unauthorized physical entry of a person's home is the chief evil against which the wording of the Fourth Amendment is directed. *United States v. United States District Court*, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), *see also Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886).

■ In summation, it appears the only valid test to determine the reasonableness of officer Shirley's actions is to balance the need to enter against the constitutionally protected right violated by such intrusion. The burden of proof is on the State to show

that "the exigencies of the situation made that course imperative." *McDonald v. United States*, 335 U.S. at 456, 69 S.Ct. at 193. The State has failed in this burden.

The judgment of the Trial Court is reversed and remanded for a new trial.

ROBERTSON, Justice, dissenting.

Believing the majority opinion does not correctly apply the law authorizing a warrantless search based upon exigent circumstances to the undisputed facts of this case, I respectfully dissent.

Both appellant and the state have briefed and argued this case upon the basis of whether the facts created exigent circumstances and an emergency authorizing a warrantless *search*. Since I agree, without any question, that they do, my discussion assumes there was a search. Not addressed by any of the parties or the court is the issue of whether this was an emergency *intrusion*, as opposed to an emergency *search* as enunciated in the cases of *Wyman v. James*, 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971), and *Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). In *Wyman*, the supreme court held that a government intrusion for a purpose other than criminal investigation is simply not a search at all and the fourth amendment is totally inapplicable. In *Cady* the supreme court overruled a challenge to a warrantless search on the ground that the purpose of the police intrusion was to perform "community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *See: Bacigal, The Emergency Exception to the Fourth Amendment* 9 U.Rich.L.Rev. 249 (1975).

Prior to trial a lengthy hearing was held on appellant's motion to suppress, but before ruling on the motion, the trial judge died. When this case was called for trial, appellant plead not guilty and entered into a lengthy written stipulation of evidence consisting of some six typewritten legal sized pages, agreeing that that evidence, along with the evidence heard by the court

on the motion to suppress, would be the evidence "and provide the factual basis for the court's determination of the guilt or innocence of the Defendant."

I have difficulty understanding the majority's statement of the evidence. My complaint is that the majority gives undue consideration to minor details and inconsistencies in the live testimony developed at the motion to suppress and apparently never considers the written stipulation of evidence introduced at trial. However, in my opinion, appellant closed the door to any argument over the facts as to whether an emergency existed when he personally signed, along with his attorney, the stipulation of evidence agreeing "that if the below-named witnesses were called, sworn and questioned, that they would give testimony in this case as set out below." For this reason I am content to rely upon and "find" the evidence from this written stipulation, supplemented, where appropriate, by the suppression hearing testimony not reflected in the written stipulation. Additionally, appellant did not testify at either the motion to suppress or trial. Therefore, I find no dispute in the basic facts which form the basis for a finding of exigent circumstances.

Since the lawfulness of the search depends upon whether there were exigent circumstances or an emergency authorizing a warrantless entry into the apartment, the facts before the trial court must be set out in some detail. This written stipulation of evidence shows that Houston Police Officer Shirley was dispatched to a large apartment complex at 2800 West T.C. Jester in the city of Houston regarding complaints of "a strong chemical odor that was making them physically ill;" that he personally inspected the area and determined "a strong chemical aroma of ether" was coming from apartment 69.

The stipulation further shows that Shirley contacted Captain Key of the Houston Fire Department "who was alarmed by Shirley's report;" that he returned to apartment 69 and "observed a gaseous cloud emanating from the patio door of apartment 69 and smelled a very strong odor of ether" with which he was familiar and *which he knew to be "extremely flamable"* [sic], *and being "concerned for the safety of the inhabitants of the entire apartment complex,"* (emphasis added) he knocked on the door and after approximately ten minutes appellant opened the door; that when the door was opened he "detected an even stronger odor of flamable [sic] ether inside the apartment 69;" and that he immediately entered and opened windows "to afford maximum emergency ventilation." Once inside Officer Shirley, who had previously worked in the narcotics division and had observed clandestine laboratories for the manufacture of methamphetamine, "immediately recognized in plain view a collection of chemical apparati, which, combined with the ether odor Shirley knew was an essential ingredient in the manufacture of many narcotic drugs, led Shirley to believe that amphetamine [sic] was being manufactured." The stipulation further recites that the only two occupants of the apartment, appellant and a female, were placed under arrest and a search and arrest warrant was obtained.

As a result of the search under the warrant "18 pieces of glassware including flasks, beakers, and jars, methylamine (which Shirley knew was a raw material necessary to the manufacture of methamphetamine), thermometers, funnels, heating and stirring devices, clamps, tubing and liquid powder substances" were recovered from the apartment. The stipulation further recites that in Shirley's opinion "the manner in which the various glass instruments and beakers and flasks were assembled on various instruments of heating and mixing were designed for the manufacture of methamphetamine." In addition, Shirley recovered from the apartment "a series of typed and handwritten notes containing chemical forumlae." It was stipulated that the chemist would testify that these notes were a "step by step guide for the manufacture of methamphetamine, which, if followed, would result in the successful manufacture of methamphetamine, and which

would require the use of the various items of chemical supply (glassware, tubing and heating mantles) and chemical substances (methalymine [sic], lye) found in apartment 69." The stipulation further provided that the chemist recovered liquid methamphetamine, "an intermediate stage in the manufacture of methamphetamine" and powdered methamphetamine from the apartment.

Appellant at trial introduced as "Defendant's Exhibit No. 1" a transcript of the testimony adduced on his motion to suppress. From this transcript we additionally learn that the "reportees," occupants of nearby apartment 76, first called the fire department at 3:59 a.m. on the morning in question. They complained of an odor making them sick; that they had smelled the same odor for several days; that the fire department responded and Fire Captain Key determined the apartment complex was "total electricity" and did not have gas service; that he detected a "faint odor of ether" but could not find the source and returned to his fire station. The evidence further shows that the reportees then called the police department and Officer Shirley arrived at the apartment complex at approximately 4:20 a.m. and that after investigating the source of the odor, he called Captain Key.

It is unclear from Key's testimony as to his instructions to Shirley regarding entering the apartment, however, *appellant* introduced into evidence a transcription of tape recorded conversations between Key and his dispatcher (made at 5:22 a.m., on the morning in question when Key had returned to the apartment complex) in which Key informed his dispatcher "I told them that it was a hazard," and acknowledged to his dispatcher that "it's (the smell of ether) strong." Finally, two additional facts for consideration are: (1) Shirley testified that he was just about to kick the door in when appellant answered his knock; (2) in addition to being extremely flammable, the evidence showed ether "puts you to sleep."

The law is clear and the majority opinion recognizes that an *objective* standard of reasonableness must be used in assessing an officer's belief that a warrantless entry was justified by exigent circumstances. *Root v. Gauper*, 438 F.2d 361 (8th Cir. 1971), citing with approval and applying this standard adopted by the United States Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) to a search under the emergency doctrine. The court of criminal appeals has likewise recognized this standard. *Bray v. State*, 597 S.W.2d 763 (Tex.Crim.App.1980).

The fallacy of the majority opinion lies in the fact that while it recognizes the "objective standard" test, it refuses to apply it. In fact, the majority opinion states: "Shirley, in response to a leading question by the state, testified that his primary concern was for the safety of the people inside apartment 69 and the residents of all the apartments." First of all, the *stipulated* evidence was that Shirley was "concerned for the safety of the inhabitants of the entire apartment complex." Second, if an objective test is applied, it wouldn't matter what his concern was, primary or otherwise, for the reason this is *subjective*, not objective. As the court said in *United States v. Callabrass*, 607 F.2d 559 (2nd Cir.1979): "We do not see, however, how Cassidy's subjective intention controls the question of whether there were exigent circumstances justifying the warrantless entry." The Supreme Court, last Term, came to a similar conclusion as the D.C. Circuit did in *Callabrass* when deciding the "public safety" exception to *Miranda* warnings, The Court stated:

In a kaleidoscopic situation such as the one confronting these officers, where spontaneity rather than adherence to a police manual is necessarily the order of the day, the application of the exception which we recognize today should not be made to depend on post hoc findings at a suppression hearing concerning the subjective motivation of the arresting officer. Undoubtedly, most police officers, if placed in Officer Kraft's position, would act out of a host of different,

instinctive, and largely unverifiable motives—their own safety, the safety of others, and perhaps as well the desire to obtain incriminating evidence from the suspect.

*New York v. Quarles,* —— U.S. ——, 104 S.Ct. 2626, 2630, 81 L.Ed.2d 550 (1984).

However, to compound the error further, the majority opinion then lists fifteen "actions [which] contradict his alleged motives." Not a single one of these "actions", except the first part of the first one (Shirley smelled ether) has *anything* to do with whether an emergency existed. A brief comment on each of these "actions" used by the majority to defeat a finding of emergency is appropriate.

In the first numbered "action", the majority points out that Shirley suspected a methamphetamine laboratory. This exact fact has been held to have no bearing on the issue of exigent circumstances. *Callabrass,* 607 F.2d at 559. Likewise it should have no bearing in this case.

In actions numbered (2), (3), (4), (5) and (6) the majority points out that Shirley took time to contact the district attorneys office and the Houston Fire Department, the advice he received from each and Shirley's subjective intent. None of these "facts" have any bearing upon whether an emergency existed. The majority apparently assumes Shirley determined an emergency existed when he arrived on the scene. The facts do not support this conclusion. It was only after appellant opened the door in response to his knocking that it was finally determined—at that moment—that an emergency existed. Appellant stipulated the facts to be that when he opened the door, Shirley "detected an even stronger odor of flamable [sic] ether inside the apartment 69" and that Shirley entered "to afford maximum ventilation" by opening the windows.

In actions (7), (8), and (15) the majority points out that the officer knocked on the door for some ten minutes, failed to get a pass key and immediately enter or "respond immediately". The majority places undue weight upon the time element. In *Callabrass,* 607 F.2d at 559, the fact that the officers waited some *four* hours for the arrival of an experienced narcotics officer did not detract from a finding that exigent circumstances existed. Similarly in *United States v. Brock,* 667 F.2d 1311 (9th Cir. 1982), there had been visual surveillance of a suspected mobile methamphetamine lab "throughout the afternoon". Later, after certain unusual activity was observed, another officer arrived and following a discussion between the officers for ten minutes, the officers decided exigent circumstances existed and ordered the occupants out and searched. The court of appeals, en banc, found an emergency existed and the United States Supreme Court denied certiorari. And finally in *United States v. Williams,* 630 F.2d 1322 (9th Cir.1980), a finding of exigency to search a motor home *five* hours after the arrests were made was justified, based on the need of agents to enter to check on the explosiveness of the chemicals.

In actions numbered (9) and (10) the majority points out that the officer "failed to determine" if appellant or anyone else in the apartment was in need of assistance before entering. The majority opinion is in error in looking only to the "needs" of appellant and his companion to find exigent circumstances. As pointed out above appellant agreed in his stipulation that the officer was "concerned for the safety of the inhabitants of the entire apartment complex."

Finally in actions (11), (12), (13) and (14) the majority points to lack of evidence that anyone in the apartment complex was in need of assistance and the failure of the officer to take certain actions. These issues are totally immaterial. It was incumbent upon the officer "to point to specific and articulable facts which, taken together with rational inferences from these facts, reasonably warrant a man of reasonable caution in the belief that the action was appropriate." The trial judge had to weigh these facts against an objective standard. We must do the same.

Ether is an extremely volatile, highly flammable liquid derived from the distillation of ethyl alcohol with sulphuric acid. Indeed, the Grecian root word from which "ether" is derived means "to ignite," "to blaze." Webster's 9th Collegiate Dictionary. In judging the articulable facts pointed out by the officer, neither the trial court nor this court can close its eyes to reality. The test relied upon by the majority commands that we apply the "man of reasonable caution" test. As Chief Justice Burger of the Supreme Court stated in an opinion authored by him while sitting on the Court of Appeals for the D.C. Circuit:

> The appraisal of exigent circumstances surrounding .... forcible entries without a search warrant presents difficult and delicate problems. These cases do not arise in the calm which pervades a courtroom or library. They are rarely if ever seen by courts except in cases where criminal activity has been uncovered by the challenged police actions. They are not matters resolved by meditation and reflection of the participants. The events are likely to be emotion-charged, filled with tension, and frequently attended by grave risks. Neither the Constitution, statutes or judicial decisions have made the home inviolable in an absolute sense. Collectively they have surrounded the home with great protection but protection which is qualified by the needs of ordered liberty in a civilized society. Breaking into a home by force is not illegal if it is reasonable in the circumstances.... The need to preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency ... When policemen, firemen or other public officers are confronted with evidence which would lead a prudent and reasonable official to see a need to act to protect life or property, they are authorized to act on that information, even if ultimately found erroneous.

*Wayne v. U.S.*, 318 F.2d 205 (D.C. Circuit 1963).

In view of the fact that while this case has been pending in this court an *illegal methamphetamine laboratory has been blamed for an explosion and fire* causing in excess of one million dollars damage to a large apartment complex not far removed in distance from the apartment complex in question, *I cannot agree* with the statement in the majority opinion that "we cannot, even in retrospect, reasonably conclude any other residents were in immediate danger." While this is not material under the test, the answer to this statement of the majority is that Officer Shirley's action in aeriating the appellant's apartment may well have prevented an explosion or fire. This court is simply not in a position to speculate as to what might have happened or that no emergency existed. Only a divine being could know what the eventual outcome would have been.

In short, I consider the question presented to be a simple one. The burden is on the state to prove that a warrantless entry fell within the emergency doctrine. *McDonald v. United States*, 335 U.S. 451, 69 S.Ct. at 191 (1948); *Janicek v. State*, 634 S.W.2d 687 (Tex.Crim.App.1982). There can be no ready test for determining reasonableness other than by balancing the need to enter against the invasion the entry entails. *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). When we apply these rules of law to the *undisputed* and *stipulated* facts, I conclude that an emergency existed. Thus, the entry was authorized.

The fact that the officer may have suspected the illegal manufacture of methamphetamine is, in my opinion, totally immaterial. What is material is whether the concentration of a combustible substance was such as to create an emergency in a large apartment complex. Likewise, the failure of the fire captain to make a more thorough investigation and to determine for himself whether he should have entered is inconsequential. Appellant's argument taken to its logical conclusion would result in an incapacity to find an emergency *if there was a difference of opinion among those present at the scene.* After all, Key

admitted that given the facts stipulated to by appellant, an emergency existed.

The material facts are that it was approximately 4:30 a.m.; that the concentration of ether was intense enough to make visible a gaseous cloud coming from the patio door of the apartment; that the officer knew ether to be extremely flammable and that this activity was occurring in a large apartment complex in the city of Houston. When his knock on the door was answered he found the concentration of ether even stronger. He entered to aeriate the apartment. Whether an exigent entry is authorized is determined by the articulable facts at the time of entry is authorized rather than being affected by what is ultimately found inside.

I would hold that upon the facts then in possession of the police officer, he was justified in entering without warrant to ventilate the apartment. Once inside he was not required to close his eyes to those items he recognized as being used in the illegal manufacture of methamphetamine. He was therefore authorized to use those facts as a basis for securing a search warrant to search the apartment and seize the evidence used to convict appellant.

There can be no question that the United States Supreme Court explicitly recognizes that exigent circumstances may in some instances justify and require a warrantless official intrusion into privacy. Surely it was precisely toward providing for such circumstances as are present here that the court formulated the emergency doctrine. If not, it is difficult, indeed, to think of a case in which it ever could be applied.

I respectfully dissent.

Paul PRESSLER, CANNON and DRAUGHN, JJ., concur.